EXHIBIT 1-C

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/15/2025 7:42 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

1 | Jason M. Ingber (SBN 318323)
Serach B. Shafa (SBN 358332)
2 | **Ingber Law Group**
3580 Wilshire Blvd., Suite 1260
3 | Los Angeles, California 90010
Tel: (213) 805-8373
4 | E-mail: ji@jasoningber.com

5 | Attorneys for Plaintiff ROMAN OULKO

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ROMAN OULKO, an individual,<br><br>Plaintiff,<br><br>v.<br><br>FIRST ELEMENT FUEL, INC., a California Stock Corporation, dba TRUE ZERO; SHELL USA, INC., dba SHELL OIL COMPANY, a Texas corporation; AIR PRODUCTS AND CHEMICALS, INC., CHEVRON U.S.A. INC., IWATANI CORPORATION OF AMERICA, and DOES 1 through 10, inclusive;<br><br>Defendants. | Case No.: 25STCV23978<br><br>**COMPLAINT FOR**<br><br>**(1) UNJUST ENRICHMENT**<br>**(2) R.I.C.O. 18 U.S.C. § 1962(c)**<br><br>**JURY TRIAL DEMANDED** |

- 1 -
**COMPLAINT FOR DAMAGES**

Plaintiff ROMAN OULKO pleads as follows:

## INTRODUCTION

1. This complaint arises from Defendants' systematic overcharging consumers purchasing hydrogen fuel at hydrogen refueling stations throughout California. Defendants' hydrogen dispensing pumps routinely indicate that more hydrogen has been dispensed than vehicles' tanks can physically hold, and fuel prices have arbitrarily tripled resulting in consumers being charged for hydrogen fuel they did not and could not receive.

2. As demonstrated by photographic evidence and consumer experiences, hydrogen pumps operated by Defendants display dispensed quantities that exceed vehicle tank capacities by significant margins—in some cases showing 6.9 kg dispensed into vehicles with 5.6 kg tank capacities, representing typical overcharges of approximately 100% when the fact that there was already fuel in the tank when Plaintiff went to fuel is accounted for.

## PARTIES

3. Plaintiff ROMAN OULKO is a resident of California and owner of a Toyota Mirai hydrogen fuel cell vehicle with a maximum tank capacity of 5.6 kilograms.

4. Defendant FIRST ELEMENT FUEL, INC. d/b/a TRUE ZERO ("First Element") is a California corporation that owns and operates hydrogen refueling stations throughout California and has contractual relationships with Toyota to provide hydrogen fuel to Toyota vehicle owners.

5. Defendant SHELL USA, INC. ("Shell") is a Texas corporation that operates hydrogen refueling stations and has partnered with Toyota and other manufacturers to develop hydrogen refueling infrastructure.

6. Defendant AIR PRODUCTS AND CHEMICALS, INC. ("Air Products") is a Delaware corporation that produces and supplies hydrogen fuel to refueling stations

throughout California and has participated in setting hydrogen fuel prices in coordination with other defendants.

7. Defendant CHEVRON U.S.A. INC. ("Chevron") is a Pennsylvania corporation that operates hydrogen refueling stations in California.

8. Defendant IWATANI CORPORATION OF AMERICA ("Iwatani") is a California corporation that operates hydrogen refueling stations throughout California.

9. Defendants have access to real-time hydrogen vehicle sales data and production forecasts via their membership in the California Fuel Cell Partnership. Armed with this insider information, Defendants knew that 2022 represented peak hydrogen vehicle sales in California, with over 12,000 vehicles on the road and more H2 vehicles sold than in any year. In a coordinated scheme, Defendants waited until this peak before executing their plan to hike up prices for fuel.

10. And, throughout this time Defendants are overcharging customers for fuel i.e. charging customers for fuel that they could not and did not purchase.

11. In 2023, after the highest number of consumers had purchased vehicles and committed to hydrogen fuel, Defendants tripled prices from approximately $13 per kilogram to $36 per kilogram—an increase that would cost each consumer an additional $115.50 per fill-up. The timing was no coincidence.

12. Through Partnership meetings, Defendants knew that auto manufacturers were quietly winding down hydrogen vehicle production—Toyota drastically reduced H2 car production after 2022, Honda had discontinued their H2 car, and Hyundai limited their H2 car availability.

13. By hiking prices after peak sales and before production ceased, Defendants ensured they could extract maximum revenue from the largest possible pool of captive consumers who had no alternative fuel options. This coordinated price manipulation transforms what automakers marketed as "$15,000 in free fuel" into a rapidly depleting asset.

14. At the original price of $13 per kilogram, the fuel cards would have provided approximately 1,154 kilograms of hydrogen—enough for nearly 4 years of typical driving. At the manipulated price of $36 per kilogram, these same cards now provide only 417 kilograms—barely 18 months of fuel.

15. Defendants effectively stole over $8,000 in value from each fuel card holder through this scheme. Most troubling, Defendants have maintained these inflated prices even as the hydrogen vehicle market collapses around them. They know from Partnership data that no new victims will enter the market, allowing them to extract maximum revenue from existing owners without fear of deterring future sales.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this action pursuant to California Code of Civil Procedure § 410.10 because Defendants conduct substantial business activities in California, operate hydrogen refueling stations throughout California, and the claims arise from conduct occurring within California.

17. Venue is proper in Los Angeles County pursuant to California Code of Civil Procedure § 395(a) because Defendants conduct substantial business in this County, operate multiple hydrogen refueling stations within this County, and a substantial part of the events giving rise to Plaintiff's claims occurred in this County.

## GENERAL ALLEGATIONS

### Background and Industry Practices

18. Under the guise of environmental progress, Defendants exploit California taxpayers and deceive consumers.

19. Defendants led lobbying efforts and obtained millions in California state tax credits and state funding for hydrogen fuel station construction. For example, the California Energy Commission provides $1,451,000 to First Element for every True Zero / First Element hydrogen fuel station. Each hydrogen station built by True Zero closes within eighteen months of opening.

4
**COMPLAINT FOR DAMAGES**

20. All California hydrogen stations are non-operational more often than they are operational -- by a significant margin.

21. The U.S. Department of Energy prepared a study analyzing maintenance and usage of California hydrogen stations for many years including the first six months of 2021.

22. During those first six months in 2021 (the peak period for hydrogen fuel pumps in California), hydrogen fuel stations spent over 11,700 hours undergoing maintenance compared to fewer than 7,200 hours pumping hydrogen. Furthermore, operational stations only ran at 60% of full capacity (due to equipment failure and hydrogen supply disruptions). Globally hydrogen fuel stations are worse at working.

23. Hydrogen fuel cell vehicles have very specific tank capacities, e.g. 5.6 kg for most current models and 6.3 for others.

24. Consumers rely on the accuracy of hydrogen dispensing pumps to charge them only for the fuel dispensed into their vehicles.

### Systematic Overcharging Scheme

25. Defendants fail to calibrate, maintain, and monitor their hydrogen dispensing equipment, resulting in systematic overcharging of consumers.

26. Photographic evidence demonstrates multiple instances where pumps display impossible dispensing quantities, for example:

    a. April 6, 2024: 5.95 kg allegedly dispensed into a 5.6 kg tank

    b. Receipt showing 6.044 kg dispensed for $217.58

    c. Numerous instances showing 6.9 kg dispensed on a car with a capacity for 5.6 kg

27. When confronted with evidence of overcharging, Defendants, if someone can ever be reached, engage in a pattern of delay, deflection, and denial, failing to provide promised refunds or address calibration issues.

### Systemic Fueling Infrastructure Issues

28. Plaintiff is plagued by persistent fueling issues that render H2 vehicles and the "free" fuel card used by H2 drivers to pay for fuel impractical for daily use.

29. Defendants operate hydrogen fueling stations with arbitrarily limited and unpredictable operational hours that strand consumers without notice. Despite marketing 24/7 accessibility on their websites, Defendants unilaterally restrict station hours without prior notification to consumers. For example, on April 14, 2024, a station changed its operating hours to 6:00 a.m. to 9:00 p.m. without any advance notice. When a consumer, Srikanth Reddy Terupally, arrived at 8:45 p.m. (well within the posted operational hours) the pump failed to dispense fuel. After keeping this consumer on hold for over 15 minutes when he called for help, customer support ultimately stated that no assistance was available after 9:00 p.m., leaving the driver stranded despite arriving during posted hours. This bait-and-switch tactic regarding station availability constitutes a material misrepresentation of the refueling infrastructure's actual accessibility.

30. Defendants impose arbitrary restrictions on prepaid fuel cards that transform equipment malfunctions into consumer penalties. Each fuel card is limited to three transactions per day, ostensibly to prevent misuse. However, when Defendants' defective pumps malfunction—which occurs regularly—the pump often initiates the fueling process, charges the card, but shuts down after dispensing minimal or no fuel, sometimes as little as $1.00 worth.

31. Despite the failed transaction being caused entirely by Defendants' equipment failure, the system counts this as one of the consumer's three daily uses. After three such equipment failures in a single day, the fuel card is locked out for the remainder of the day, leaving drivers stranded through no fault of their own. This systematic conversion of Defendants' infrastructure failures into consumer penalties demonstrates the predatory nature of the fuel card restrictions.

32. Defendants operate a coordinated system of denial and deflection when consumers report station malfunctions, creating a circular pattern of blame that leaves

drivers stranded. When pumps that appear operational online fail to dispense fuel, customer service representatives routinely deny any problem exists or claim no technician is available. When consumers escalate these issues to their vehicle manufacturers' customer support, those representatives must contact the fuel station operators to verify the malfunction. In a pattern of deliberate deception, station operators consistently report to the vehicle manufacturers that pumps are functioning properly even when they are demonstrably non-operational. This creates a manufactured dispute where consumers must prove equipment failures while stranded at non-functioning stations, effectively shifting the burden of Defendants' infrastructure failures onto the very consumers who have already paid for fuel they cannot access. This coordinated denial system between fuel providers and their automotive partners demonstrates the Enterprise's unified effort to avoid accountability for systematic infrastructure failures.

33. As mentioned, hydrogen fuel nozzles jam during refueling, causing significant delays and safety concerns.

34. The California fueling standard that these companies set in their partnership with the California Fuell, SAE J2601, mandates that stations must recompress hydrogen between refueling sessions, a process that takes over 30 minutes.

35. Moreover, these companies are in an association together called the California Fuel Cell Partnership where they confer regularly with the benefit of their knowledge of consumer pricing for gasoline.

36. The Defendants worked together to arbitrarily price hike hydrogen fuel with a phantom market they control. Defendants collectively tripled the price of hydrogen fuel in a matter of less than a year sucking out the cash from the fuel cards.

37. Contrary to Defendants' representations about convenience of the infrastructure on their websites, expanding nature of the infrastructure, and overall accessibility to stations, hydrogen fuel stations in California are consistently non-operational due to maintenance or supply issues.

# FIRST CAUSE OF ACTION

## Unjust Enrichment

## (Against all Defendants)

38. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

39. When a consumer purchases hydrogen fuel, they enter into a simple contract: the consumer agrees to pay for a specific quantity of hydrogen fuel, and the seller agrees to deliver that exact quantity of fuel into the consumer's vehicle.

40. The fundamental terms of this transaction are displayed on the pump and memorialized in the receipt:

    a. The price per kilogram of hydrogen: $36.00/kg

    b. The quantity allegedly dispensed: 6.044 kg

    c. The total charge based on quantity multiplied by price: $217.58

### Improper Charges

41. Defendants systematically charge consumers for hydrogen fuel that was never delivered because it is physically impossible to deliver the quantities charged. Specifically:

    a. Despite the physical limitation of the hydrogen car tanks, Defendants routinely charge for quantities exceeding tank capacity:

        i. On April 6, 2024, Defendants' pump displayed 5.95 kg of hydrogen

        ii. On January 17, 2025, Defendants charged Plaintiff $217.58 for 6.044 kg of hydrogen

        iii. Both amounts are physically impossible to dispense into a 5.6 kg tank

    b. **Mathematical Proof of Improper Charges**:

        i. Maximum tank capacity: 5.6 kg

        ii. Amount charged: 6.044 kg

       iii.      Overcharge: 0.444 kg (6.044 - 5.6)

       iv.      At \$36.00/kg: 0.444 kg × \$36.00 = \$15.98 minimum overcharge per transaction.

42. A charge is only proper when the consumer receives the product or service paid for. Here:
    a. Defendants charged for 6.044 kg of hydrogen
    b. Only a maximum of 5.6 kg could possibly have been delivered
    c. The excess 0.444 kg was never delivered because it could not be delivered
    d. Defendants collected payment for a product that does not exist in Plaintiff's vehicle

43. The improper charges are systematic, not isolated:
    a. Multiple incidents across different dates: April 6, 2024 and January 17, 2025
    b. Multiple instances of charges exceeding tank capacity: 5.95 kg and 6.044 kg both exceed the 5.6 kg maximum
    c. Consistent pattern of overcharges for example such as 6.25% overcharge (April 6, 2024) and 7.9% overcharge (January 17, 2025)
    d. Defendants are Sophisticated Fuel retailer with extensive experience in fuel dispensing know the charges are improper.

<u>Failure to Correct Improper Charges</u>

44. When confronted with evidence of improper charges, Defendants compound the problem:
    a. Plaintiff first contacted Defendants on January 17, 2025
    b. Despite promises of refunds from Eddie, James Troup, and Trisha
    c. After calls on January 30, February 4, February 27, February 28, and April 22

    d.    No refund has been issued for the obviously improper charges.

45.    Excuses Confirm Impropriety: James Troup's response that "Nexo holds 6.33 kg from zero" is revealing because:

    a.    Plaintiff owns a Mirai, not a Nexo

    b.    The fill was from 1/3 tank, not from zero

    c.    This shows Defendants either don't understand their own systems or are being deliberately deceptive.

46.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

47.    Defendants have received and retained money from Plaintiff and class members for hydrogen fuel that was never delivered because it could not physically fit in vehicle tanks.

48.    Specifically, Defendants have been enriched by:

    a.    Collecting $217.58 from Plaintiff while delivering at most $201.60 worth of hydrogen (5.6 kg × $36.00/kg)

    b.    Retaining the $15.98 difference for 0.444 kg of hydrogen that does not exist

    c.    Multiplying this overcharge across thousands of transactions

49.    Defendants' enrichment is unjust because:

    a.    They charged for a product they did not and could not deliver

    b.    They know vehicle tank capacities cannot exceed manufacturer specifications

    c.    They have refused to refund obvious overcharges despite months of requests

50.    It would be inequitable and unconscionable for Defendants to retain money paid for hydrogen that was never delivered.

51.    Plaintiff and class members are entitled to restitution of all amounts paid for hydrogen quantities exceeding their vehicles' tank capacities.

**SECOND CAUSE OF ACTION**

**COMPLAINT FOR DAMAGES**

**R.I.C.O. 18 U.S.C. § 1962(c)**

**(Against all Defendants)**

52. Plaintiff realleges and incorporates by reference all preceding paragraphs.

53. Defendants constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), operating as the California Hydrogen Cartel through formal and informal channels.

54. The Enterprise operates in part through the California Fuel Cell Partnership, where Defendants meet and coordinate some activities.

55. Through joint lobbying efforts, Defendants obtain state funding and tax credits while maintaining coordinated infrastructure development agreements.

56. The Enterprise engages in systematic information sharing regarding pricing, supply, and consumer data while maintaining joint control over hydrogen supply chains and distribution networks.

57. The Enterprise operates with a common purpose of extracting maximum revenue from captive hydrogen vehicle owners through coordinated overcharging and price manipulation. Its organizational structure consists of regular meetings, shared pricing data, coordinated maintenance schedules, and joint decision-making through the California Fuel Cell Partnership.

58. The Enterprise has operated continuously since at least 2020 through the present, affecting interstate commerce through hydrogen production, distribution, and sales across state lines.

59. Within the Enterprise, each Defendant plays a specific role. First Element, doing business as True Zero, controls the majority of California hydrogen stations and sets pricing benchmarks for the industry. Shell provides interstate distribution networks and participates in pricing coordination. Air Products controls hydrogen production and artificially constrains supply to maintain inflated prices. Chevron leverages its gasoline pricing knowledge to coordinate hydrogen pricing strategies. Iwatani operates stations and participates in price-setting meetings.

60. The Enterprise operates in direct coordination with foreign automobile manufacturers through the California Fuel Cell Partnership.

61. Through this partnership, Defendants receive real-time data on hydrogen vehicle sales, production schedules, and future manufacturing plans. This insider information enables Defendants to time their price manipulation for maximum extraction of consumer wealth.

62. Specifically, Defendants knew that 2022 represented peak hydrogen vehicle sales in California, with the automakers selling more hydrogen vehicles that year than any previous year.

63. Armed with this knowledge from their auto manufacturer partners, Defendants coordinated to triple hydrogen prices in early 2023, precisely when the maximum number of captive consumers had purchased vehicles and committed to hydrogen fuel.

64. Defendants engaged in a pattern of racketeering activity consisting of multiple acts of mail fraud in violation of 18 U.S.C. § 1341. This mail fraud includes mailing false receipts showing inflated hydrogen quantities, sending fraudulent refund promises never intended to be fulfilled, and mailing marketing materials containing false claims about station reliability.

65. Each mailed receipt constitutes a separate predicate act of mail fraud. The pattern of racketeering also includes systematic wire fraud in violation of 18 U.S.C. § 1343.

66. Defendants engage in electronic processing of fuel card transactions for hydrogen never delivered, wire transmissions of false dispensing data from pumps to payment systems, and electronic coordination of price increases through digital communications.

67. Each electronic transaction constitutes a separate predicate act of wire fraud.

68. Additionally, Defendants engage in conspiracy to restrain trade by coordinating to triple hydrogen prices within one year, agreeing to maintain prices at

artificially inflated levels, and sharing competitive pricing information through the Partnership.

69. These predicate acts form a pattern of racketeering activity due to their relatedness, as all acts further the common scheme to defraud hydrogen consumers. The pattern demonstrates continuity, occurring daily since at least 2021 and continuing indefinitely, with thousands of fraudulent transactions per month across California. Each transaction follows the same modus operandi of systematic overcharging.

70. The price-fixing and overcharging conspiracy operates in three distinct phases. In Phase One, Infrastructure Capture, Defendants obtained over twenty-nine million dollars in state funding by promising affordable, reliable hydrogen infrastructure.

71. Once consumers purchased vehicles and committed to fuel cards, Phase Two, Market Manipulation, began. Defendants coordinated to triple prices from approximately thirteen dollars per kilogram to thirty-six dollars per kilogram in under twelve months.

72. They maintain stations in perpetual "maintenance" status to sustain artificial scarcity while calibrating pumps to systematically overcharge by approximately twenty-five percent.

73. Phase Three involves systematic Revenue Extraction. Defendants charge for 6.9 kilograms of hydrogen when vehicle tanks hold only 5.6 kilograms, refuse refunds when caught overcharging, and maintain monopolistic control over all refueling options. Critically, Defendants have maintained these inflated prices even as their auto manufacturer partners in the California Fuel Cell Partnership wind down hydrogen vehicle production.

74. Through Partnership meetings, Defendants know that Toyota drastically reduced Mirai production after 2022, Honda discontinued the Clarity Fuel Cell, and Hyundai limited Nexo availability.

75. This coordination ensures maximum revenue extraction from existing owners who cannot switch to alternative vehicles, while auto manufacturers avoid consumer backlash by quietly exiting the market.

76. The timing is no coincidence—Defendants waited until peak market saturation to execute their price manipulation, knowing from their manufacturing partners that no new consumers would enter the market to complain.

77. The Enterprise specifically targets prepaid fuel card holders in what constitutes a "Fuel Card Trap."

78. Toyota and Hyundai provide fifteen-thousand-dollar fuel cards with vehicle purchases, and Defendants coordinated price increases to accelerate card depletion. Card holders cannot use these funds elsewhere, creating captive victims for systematic extraction of full card value through overcharging.

79. The auto manufacturers' complicity is evident in their silence—despite being active California Fuel Cell Partnership members alongside Defendants, Toyota, Honda, and Hyundai have taken no action to protect their customers from the coordinated price manipulation.

80. This silence is bought through the Partnership's structure, where auto manufacturers benefit from state subsidies for "zero emission vehicles" while Defendants handle the extraction of consumer wealth.

81. The manufacturers knew that announcing the wind-down of hydrogen vehicle production while fuel prices remained low would devastate used vehicle values, so they coordinated with Defendants to maintain artificially high fuel prices to mask the technology's failure until existing inventory could be sold.

82. The Enterprise affects interstate commerce by purchasing hydrogen produced and transported across state lines, using interstate banking systems for payment processing, coordinating with out-of-state parent companies, and affecting national hydrogen infrastructure development.

83. Defendants' racketeering activity directly caused Plaintiff's injuries. But for the coordinated price-fixing, hydrogen would cost approximately thirteen dollars per kilogram, not thirty-six dollars.

84. But for the calibration fraud, Plaintiff would pay only for fuel actually received. But for the refund fraud, Plaintiff would have recovered overcharges. Plaintiff suffered concrete economic injuries from this racketeering activity.

85. Overcharge injuries amount to $15.98 per fill from calibration fraud.

86. Price-fixing injuries total around $115.50 per fill from artificial price inflation, calculated as 5.6 kilograms multiplied by the twenty-three dollar difference between the conspiratorial price and competitive price.

87. Total RICO-attributable damages equal $131.48 per fill, resulting in annual damages of approximately $6,574 per vehicle based on fifty fills per year.

88. The coordinated timing with auto manufacturers amplifies these damages—by executing the price increase immediately after peak vehicle sales in 2022, Defendants ensured the maximum number of consumers (over 12,000 hydrogen vehicle owners in California) would be subjected to the scheme.

89. Had Defendants raised prices earlier, auto manufacturers would have sold fewer vehicles; had they waited longer, the dwindling production would have reduced the victim pool.

90. This precise timing, coordinated through California Fuel Cell Partnership data sharing, maximized both the number of victims and the duration of their captivity.

91. Thus, this is a historic RICO Conspiracy - 18 U.S.C. § 1962(d) as Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to participate in the Enterprise's affairs, agreeing to commit predicate acts of racketeering, knowing their agreed conduct would further the conspiracy, and committing overt acts in furtherance thereof.

92. Overt acts in furtherance of the conspiracy include attending California Fuel Cell Partnership meetings to coordinate pricing, simultaneously raising prices across

all stations, sharing calibration manipulation techniques, and agreeing to refuse refunds when overcharging is discovered.

93. Most significantly, Defendants coordinated with auto manufacturers through Partnership meetings to obtain vehicle sales data and production forecasts.

94. In late 2022, as Partnership data showed hydrogen vehicle sales reaching their peak with over 12,000 vehicles on California roads, Defendants executed their coordinated price increase. Partnership meeting minutes would show discussions of "market maturity" and "infrastructure sustainability" as euphemisms for extracting maximum revenue from captive consumers.

95. The conspiracy's sophistication is demonstrated by Defendants maintaining elevated prices even as Partnership data showed automotive partners abandoning hydrogen vehicle production, confirming this was not a response to market forces but a coordinated scheme to extract maximum value before the market's inevitable collapse.

96. Defendants constitute an enterprise systematically defrauding fuel card holders.

97. The enterprise operates through the California Fuel Cell Partnership to coordinate extraction of prepaid card value.

98. Pattern of racketeering activity targeting fuel cards:

a. Mail Fraud: False receipts showing inflated quantities charged to cards

b. Wire Fraud: Electronic fuel card transactions for hydrogen never delivered

c. Thousands of fraudulent charges exceeding tank capacity.

99. The scheme successfully extracts $15,000 per card through: a. Overcharging cards for impossible quantities b. Coordinated price increases to accelerate depletion c. Refusing card credits when caught d. Creating no escape for captive card holders

100. The pattern continues daily as fuel cards are systematically drained at every fill-up.

101. Plaintiff seeks treble damages under RICO for the fraudulent depletion of prepaid fuel cards.

## DAMAGES

A. Plaintiff provides the following damages framework for the Court:

B. Individual Damages Example (e.g. Plaintiff's January 17, 2025 Transaction):

    a. Amount Charged: $217.58 (for 6.044 kg at $36.00/kg)

    b. Maximum Possible Charge: $201.60 (for 5.6 kg at $36.00/kg)

    c. Direct Overcharge: $15.98

    d. Interest (10% per annum from January 17, 2025): Accruing daily

    e. Consequential Damages: Time value and effort over 5-month refund attempt

C. Damages Formula: For each transaction where Quantity Charged > Vehicle Tank Capacity:

    a. Overcharge = (Quantity Charged - Tank Capacity) × Price per kg

    b. Interest = Overcharge × 0.10 × (Years since transaction)

    c. Total per transaction = Overcharge + Interest

D. Injunctive relief to lower prices and create a more transparent purchasing process.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: August 12, 2025                                             INGBER LAW GROUP

                                                                                  */s/ Jason M. Ingber*
                                                                                  Jason M. Ingber, Esq.
                                                                                  Attorney for Plaintiff